**Morris Lynn GULETT, Plaintiff,**

v.

**Gary HAINES, et al., Defendants.**

**Case No. C–3–99–447.**

United States District Court,
S.D. Ohio,
Western Division.

June 14, 2002.

Charles A. Smiley, Jr., Jeffery S. Rezabek Charles Smiley & Associates Dayton, OH, for Plaintiff.

Victor Terrell Whisman, John Alan Cumming, Montgomery County Prosecutor's Office, Gregory Paul Dunsky, United States Attorney's Office, Dayton, OH, for Defendants.

## DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 51); OVERRULING MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT (DOC. # 52); AND SUSTAINING MOTION OF PLAINTIFF FOR LEAVE TO FURTHER AMEND COMPLAINT (DOC. # 56)

RICE, Chief Judge.

Plaintiff Morris L. Gulett alleges in his First Amended Complaint (Doc. # 22) that certain of his rights guaranteed by the United States Constitution and the law of Ohio were violated while he was incarcerated in the Montgomery County (Ohio) Jail ("County Jail"). He named as Defendants Gary Haines, the late Montgomery County Sheriff,[1] Christopher Jolly,[2] a County Jail corrections officer, Kelvin S. Curry, a County Jail inmate, and multiple as-of-yet unidentified John Does. In Branch One of his First Amended Complaint, the Plaintiff claims that the Defendants violated his right to contract, actionable under 42 U.S.C. § 1981. In Branch Two, he claims that Defendants violated his Fourteenth Amendment rights, actionable under 42 U.S.C. § 1983. In Branch Three, he alleges Defendants conspired to violate his constitutional rights, actionable under 42 U.S.C. § 1985. In Branches Four, Five, and Six, he sets forth state law claims for negligence, civil assault, and improper hiring and supervision, respectively, and in Branch Seven, he seeks punitive damages.

The Defendants and Plaintiff both have moved for summary judgment. (*See* Doc. # s 51 & 52.) Plaintiff has also moved to amend his First Amended Complaint in order to expressly name Officer Jolly in the pleadings of Branches Two, Three, and Four. (*See* Doc. # 56.)

### I. *Background Facts*[3]

Plaintiff is a resident of Louisiana who was being held in the County Jail on and around September 13, 1997, pending trial on various criminal charges. (Gulett Aff., attached to Doc. # 52, ¶¶ 2 & 10.) At that time, he was sequestered in a segregated

---

**1.** To the extent Sheriff Haines was named in his official capacity, the current Sheriff, David Vore, is substituted as the real Defendant in interest. *See* Fed.R.Civ.P. 25(d)(1).

**2.** This Defendant's last name was spelled "J–O–L–L–E–Y" in the Plaintiff's First Amended Complaint. The Defendant himself has spelled his name in various filings both "J–O–L–L–E–Y" (*e.g.,* Answer to Pl.'s First Am. Compl. (Doc. # 33)), and "J–O–L–L–Y" (*e.g.,* Defs.' Mot. Summ. J. (Doc. # 51) & Jolly Aff.,

Doc. # 51 at Ex. D.) The Court will assume for present purposes that the latter spelling, which omits the "E", is correct.

**3.** For purposes of ruling on the Defendants' Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiff, who is the non-moving party. Conversely, in ruling on the Plaintiff's Motion for Summary Judgment, the

unit, or cellblock, of the County Jail, away from the general jail population, meaning that he had little contact with other prisoners. (*Id.* ¶ 6.) This was an eleven-cell cellblock, each cell housing a single inmate. (*Id.* ¶ 8.) In this particular cellblock, designated at the jail as E–4–S (Jolly Aff., attached to Doc. # 51 at Ex. D, ¶ 1), each inmate, at separate times, was allowed to spend one hour each day, alone, in the cellblock "range," an open corridor which ran the length of the cellblock. (Gulett Aff. ¶ 8.) In the range, the inmate could shower, talk on the telephone, exercise, or lounge and watch television. (*Id.*) Curry was in the same cellblock as the Plaintiff. (Jolly Admissions, attached to Pl.'s Memo. in Supp. of Pl.'s Mot. for Summ. J. (Doc. # 55), Answer No. 4.)[4] An inmate's access to the range from his cell was controlled by an electro-mechanical device, the controls to which were operated exclusively by corrections officers at a location situated outside of the range. (*Id.*, Answer Nos. 5, 6, & 7.)

According to Plaintiff, on September 13, 1997, Officer Jolly was in charge of cellblock E–4–S. (Gulett Aff. ¶ 15; Gulett Depo. at 44). During his hour in the range, Plaintiff heard the sound of a cell door opening. (Gulett Aff. ¶ 10.) Believing the sound to be coming from a neighboring cellblock, he was not alarmed, and did not turn around. (*Id.*) Thereafter, he alleges that he was beaten by one or more "attackers," whom he could not identify except to note that he (or they) was (were) black. (*Id.*) He managed to push a panic alarm button, and Officer Jolly responded to the scene. (*Id.*; Jolly Aff. ¶ 7; County Jail Incident Report of Sep. 13, 1997, attached to Flanagan Aff., attached to Doc. # 51 at Ex. B ("Incident Report").) As a result of the alleged beating, Plaintiff suffered a broken nose, damage to an eardrum, and other lacerations. (Gulett Aff. ¶¶ 11, 12, 13, & 14.)

While not denying that the Plaintiff's version of what transpired is plausible, Defendants point out that Curry told Officer Jolly, pursuant to the officer's follow-up investigation into the matter, that the Plaintiff had fallen on the floor and hit his head. (*See* Incident Report.) Still and all, Defendants also contend that the Plaintiff was asked if he would like to press charges against Curry,[5] but that he refused (although he did not sign the "prosecute refusal form"). (*See id.*) Plaintiff disputes this fact, and claims that although he chose not to file a police report upon his discharge from the County Jail in March of 1998,[6] he never refused the offer to prosecute while he was still in custody, and, in

---

Court will construe the facts and inferences in the light most favorable to the Defendants.

4. The Admissions relied upon herein by the Court, submitted by Jolly in response to Plaintiff's First Request for Admissions, have been sufficiently authenticated by Jolly's own references thereto in his affidavit, attached as Exhibit D to Document No. 51.

5. Although he did not see who "attacked" him in the range, Officer Jolly states that the Plaintiff identified Curry as the person who hit him. (Jolly Aff. ¶ 10.) No explanation has been tendered by the Plaintiff as to how he could have known that Curry was his attacker. He has filed a Motion for Order Deeming

As Admitted Those Requests for Admissions Propounded Upon Defendant Curry (Doc. # 43), given the fact that Curry has not responded to such. If so admitted, Answer No. 1 therein would establish that Curry was involved in a "fight" with Plaintiff on September 13, 1997. Because of the manner in which the relevant request for admission is framed, even if the Court were to sustain this Motion, it would not establish that Curry was the Plaintiff's attacker in the incident in question. Nor would the deemed admission collaterally estop the remaining Defendants from arguing that the "fight" never occurred.

6. Plaintiff was released from jail in March, 1998, on a term of probation. (Gulett Aff. ¶ 3.)

fact, he indicated to an officer that he *did* want to prosecute. (Gulett Depo. at 65.)

The basis for the Plaintiff's action against the Sheriff's Department is that other prisoners in cellblock E–4–S should not have been allowed into the range during his solitary hour, and that if one or more of them were so allowed, it must have been the result of a corrections officer allowing it to happen, as only corrections officers have access to the cell door locking controls. Defendants contend that even if it is true that Curry attacked the Plaintiff, the Plaintiff's explanation of how it happened is not necessarily accurate. Lieutenant Robert Flanagan, the Housing Officer in charge of the County Jail, and the custodian of jail records, states that at least two other feasible explanations exist for how Curry could have attacked the Plaintiff without the assistance of a corrections officer. Under one scenario, the Plaintiff may have approached Curry's cell from the range, and gotten too close, such that Curry could have punched him in the face from within his cell. (Flanagan Aff. ¶ 7.) Under a second scenario, Lieutenant Flanagan states that it is not unheard of in cellblock E–4–S for an inmate to lodge a foreign object in the track of his cell door, preventing its complete closure and lockage, thus creating an unauthorized egress to the range. (*Id.* ¶ 8.)

In any event, after Officer Jolly responded to the panic alarm, he called for medical assistance, and transported the Plaintiff to the County Jail's medic's office for treatment. (Jolly Aff. ¶ 9; Gulett Aff. ¶ 11.) Jail medical records indicate that an outside physician, Dr. Devore, was contacted that same day, and advised that the Plaintiff's ear be kept dry. (Staff Progress Notes, attached to Flanagan Aff.)[7] On September 15, 1997, an appointment for the Plaintiff to see Dr. Devore was scheduled for September 29, 1997. (*Id.*) Defendants contend that due to a conflict with a scheduled court appearance of the Plaintiff, the appointment with Dr. Devore was pushed back to October 7. (*Id.*) At that appointment, the Plaintiff was scheduled for an operation to re-break and reset his nose, which had begun to heal improperly. (*Id.*; Gulett Aff. ¶ 13.) The Plaintiff himself asserts that he was in pain for days after September 13, 1997, but that his repeated requests to be taken to a hospital for treatment were refused. (Gulett Aff. ¶ 12.) He states that he was not aware of the appointment scheduled for September 29, and that had he been, he would have attempted to reschedule his conflicting court appearance. (*Id.*) Furthermore, he stated in his deposition that he filed a grievance in protest of being denied speedier care. (Gulett Depo. at 33.) That grievance was answered several weeks later, but he was unable to recall what the County Jail's explanation was for not getting him in to a doctor sooner. (*Id.* at 34.)

Upon his release from the County Jail, the Plaintiff sought treatment from an ear, nose and throat specialist, Dr. Lawrence Danna. (*Id.* ¶ 14; Danna Aff., attached to Doc. # 55, ¶¶ 1 & 2.) Dr. Danna states that the Plaintiff has continuing ear and nose problems, due in part to a delay in receiving proper care. (Danna Aff. ¶ 2.) Among the problems identified by Dr. Danna are a ringing in the Plaintiff's ears which will likely be permanent, loss of hearing, a left nasal septal deviation which may require further surgery, and headaches. (Letters of April 24, 2001 & March 6, 2002, from Dr. Danna to Pl.'s counsel, attached to Danna Aff.)[8]

---

7. The facts contained in the jail medical records would be admissible at trial under Fed. R.Evid. 803(6).

8. The facts contained in the two opinion letters written by Dr. Danna and addressed to counsel for Plaintiff were incorporated by reference into his affidavit. (*See* Danna Aff. ¶ 2.)

Plaintiff, who is white, believes that he was subjected to mistreatment in the County Jail by jail officials and other inmates because of his association with a white supremacy group (Gulett Aff. ¶ 7), and because the criminal charges on which he was being held included making threats against police officers. (*Id.; see also* Indictment of the Grand Jury of Montgomery County, Ohio, March 1, 1997 (filed on March 7, 1997), against Morris Lynn Gulett, Doc. # 51 at Ex. A.) [9] He argues that as a ward, he was entitled to protection from other inmates whom jail officials should have known were likely to harbor malice toward him on account of his racist beliefs, and that this they failed to do. Arguing that there is complete lack of proof of wrongdoing on their part, Defendants Haines and Jolly move for summary judgment. Plaintiff also moves for summary judgment.

Previously, because Curry did not respond to his pleadings, the Plaintiff moved for, and the Court granted, default judgment as to Curry on liability alone. (Doc. # 47 & Notation Order of March 4, 2002.)

## II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also*

---

**9.** The copy of the Indictment, filed by Defendants, has not been authenticated. However, the Court finds this harmless, as the facts contained therein are immaterial.

*Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110

S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis*

Plaintiff has expressly abandoned his claim arising under 42 U.S.C. § 1981 (Branch One). (*See* Doc. # 57 at 2 & n. 1.) As such, the Court will not consider the pleadings as stated thereunder, or the arguments of Defendants related thereto.

With respect to the other claims, the Court will consider the merits of Defendants' Motion, and then that of Plaintiff. As an initial matter, the Court feels obliged to distinguish between that evidentiary matter to which the Plaintiff is and is not competent to offer testimony. The Court finds that the Plaintiff is competent to testify as to which corrections officer was in charge of his cellblock on September 13, 1997. (*See* Gulett Aff. ¶ 15.) This fact, the Court believes, is one which an inmate might have reason to know on the basis of observation and routine. On the other hand, he has adduced nothing to satisfy the Court that he is competent to testify to the fact that "any other corrections officer would have to get the key from Jolley [sic] to access ... the cell door controls." (*Id.*) Nor is he competent to testify as to whether he received timely or

proper medical care, as such assertions constitute opinions which are the domain of trained professionals. (*See id.* ¶ 16.) Finally, his thoughts and opinions on the medical procedures practiced in the County Jail, and the sufficiency thereof, are equally incompetent and unilluminating. (*See id.* ¶¶ 17, 18, 19, & 20.)

### A. Defendants' Motion for Summary Judgment (Doc. # 51)

The Court will address this Motion first as it relates to Sheriff Haines, and then as it relates to Officer Jolly.

### 1. Sheriff Haines

To the extent it concerns the Sheriff, Plaintiff's action lacks merit.

■ 42 U.S.C. § 1983, the basis for Plaintiff's second claim (Branch Two), provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton* 38 F.3d 282, 286 (6th Cir.1994). "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir.2000)

(citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Herein, there is no dispute that Sheriff Haines did not himself take affirmative acts against Plaintiff, and there is no evidence that he had any contact with Jolly or any other person at the County Jail on the day in question, or in any way, at any time, communicated with anybody at the County Jail concerning the treatment of the Plaintiff. That being the case, and given the fact that § 1983 does not contemplate vicarious liability claims, *see Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), liability must be premised on some other ground, presumably supervisory liability or municipal liability, both of which Plaintiff places into a single ground for relief. Neither theory is supported by the facts he has adduced.

■ To begin with, supervisory liability is just another form of individual liability.[10] "[A] supervisor is not liable for failing to supervise the offending employee unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Comstock v. McCrary,* 273 F.3d 693, 712–13 (6th Cir.2002) (citation and internal quotation omitted). Even if the Plaintiff could show that Sheriff Haines authorized, approved, or knowingly acquiesced in the unconstitutional conduct of an offending officer, which he has not, Sheriff Haines is no longer alive and thus

---

10. The Plaintiff did not specify whether Sheriff Haines was named in an official or individual capacity. The Court presumes it was in his official capacity, but failure to expressly state individual capacity is not fatal to such a theory of recovery. *See Moore v. City of Harriman,* 272 F.3d 769 (6th Cir.2001)(*en banc*).

This issue was not addressed by the parties, and the Court notes it here only to give the Plaintiff the full benefit of the doubt. In any event, as the Court will discuss below, any individual capacity claims intended, be they under § 1983 or otherwise, are defective for other reasons.

can no longer be held liable for his individual actions. Nor can any other party be substituted at this time because the Plaintiff did not file a notice of substitution pursuant to Fed.R.Civ.P. 25(a)(1). Although Sheriff Vore is automatically substituted to the claim insofar as Sheriff Haines was sued in his official capacity, *see* Fed.R.Civ.P. 25(d)(1), the same is not true with respect to individual capacity claims.

To the extent Sheriff Haines was sued in his official capacity as a representative of Montgomery County, such that liability might be based on a showing that the county, as a matter of custom, implicitly authorized, approved, or knowingly acquiesced in any unconstitutional conduct, *see Monell*, 436 U.S. at 691, 98 S.Ct. 2018, the Plaintiff has failed to show a genuine issue of material fact. Although Montgomery County may be subject to liability for an unconstitutional custom established by its Sheriff, acting in his capacity as the final decision maker as to County Jail customs or practices, *see, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Plaintiff has failed in this instance to demonstrate a jail custom that runs afoul of the Constitution or some other federal law. He points to the emergency medical care policy of the County Jail as the unconstitutional custom on which municipal liability may be found. The Court disagrees with his assessment.

■ To begin with, the Court notes that the Plaintiff's § 1983 claim is premised on violations of due process generally, as guaranteed by the Fourteenth Amendment. It has been held that the deliberate indifference of prison officials to the serious medical needs of a convicted prisoner violates that prisoner's Eighth Amendment right to be free from cruel and unusual punishment, *see Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and that such a right is guaranteed against the States pursuant to the Due Process Clause of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *See also Alvarado v. Litscher*, 267 F.3d 648, 651 (6th Cir.2001). When *Estelle* applies, the Court must evaluate the seriousness of the prisoner's medical needs from an objective perspective, and then determine whether the Defendants were deliberately indifferent from a subjective perspective. *See Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir.1992), *cert. denied, sub nom. Hunt v. Bradley*, 510 U.S. 1052, 114 S.Ct. 709, 126 L.Ed.2d 675 (1994). However, Plaintiff was not a "convicted" prisoner at the time of the events at issue, and it has been held by at least one circuit court that because pre-trial detainees are guaranteed a right of proper medical care directly under the Due Process Clause, and not through the incorporation of the Eighth Amendment into the Fourteenth Amendment, the deliberate indifference of the officials must be viewed from an objective perspective. *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996).[11] While it is settled in the Sixth Circuit that pre-trial detainees are guaranteed "at least" as many rights as convicted prisoners, *see Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990),[12] the

---

**11.** The Eighth Amendment right to be free from cruel and unusual punishment can only be invoked after a finding of guilt, given that the state itself is only allowed to administer punishment after such time. *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199 & n. 6, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Prior to conviction, protections from state abuse are found in the Due Process Clause of the Fourteenth Amendment. *See id.*

**12.** *See also City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

Sixth Circuit has never adopted what would appear to be the more protective standard of the Second Circuit.[13]

▮ Regardless of the standard to be employed, denial of, or deliberate indifference to the need for, necessary medical coverage is the sort of fact question presented on a case-by-case basis. *See Weyant*, 101 F.3d at 856. Short of a written policy which actually mandates that jail officials be deliberately indifferent to the serious medical needs of all prisoners, something which has most certainly not been presented in this case, a plaintiff's claim turns on the actual deeds of his defendants. As already noted, Sheriff Haines did not have any interaction with the Plaintiff, and there is no evidence that he had any interaction with any jail officials who dealt with the Plaintiff. Thus, even if the Plaintiff could show that his serious medical needs were left unattended, the only means to find the Sheriff liable under this set of facts would be on a *respondeat superior* theory, which, as stated, is not contemplated by § 1983.

The Plaintiff argues that the County Jail emergency medical care policy was unconstitutional not for what it said, but for what it did not say. Specifically, the Plaintiff asserts that pursuant to the County Jail's policy, emergency medical conditions are assessed as arising under one of three specific categories of illnesses or injuries. (Doc. # 55 at 22–23; Doc. # 57 at 8.) This policy, he argues, is defective, *first*, in that it does not address how jail personnel is to handle non-life-threatening emergencies, such as broken bones. *Second*, it leaves medical decisions to the jail's "medical director," but does not expressly require that this individual be a licensed physician. *Third*, final authority for how to handle medical treatment is vested with the "jail administrator," further directing that care-making decisions be vested with someone other than a physician.

The Plaintiff's argument fails when read in light of the documentation he has attached to support his argument. Attached to his Memorandum in Support is what is purported to be the County Jail policy toward emergency care, entitled Emergency Treatment of Injuries Sustained in Facility ("Emergency Policy"). (Doc. # 55 at Ex. I.) This exhibit is not authenticated, but what is more, there is no attestation from any person competent to declare that this is the complete policy followed by jail personnel in rendering emergency treatment to prisoners. As such, it would be imprudent for the Court to adjudge the merits of the County Jail's Emergency Policy on the basis of this exhibit alone. Furthermore, even if the Court *were* to view this exhibit as the complete jail policy toward emergency care, the Plaintiff has not proffered affidavit testimony of any person competent to render an opinion on the sufficiency of said policy. All he has proffered is his own opinion that the Emergency Policy is deficient, presumably based upon his own experience. That is no better than no evidence at all. Finally, even giving the Plaintiff the fullest benefit of the doubt, the exhibit he attached to his

13. Presumably, the difference between the two would be that under an objective test, an official could be found to have been deliberately indifferent if he had negligently, or unreasonably, ignored a duty to provide an inmate with necessary care, whereas under a subjective test, it would have to be shown that the official had actually appreciated the inmate's needs, and then purposefully ignored them without regard to the consequences.

Read literally, the words "deliberate indifference" would appear to require the latter showing, as has been held in the Eighth Amendment setting. Were the meaning of "deliberate indifference" intended to be something different in the Due Process Clause setting, presumably the Supreme Court and the Sixth Circuit would have chosen words other than "deliberate indifference" in the first instance.

Memorandum in Support does not say that which he contends it does. The Court finds no evidence that the jail lumps injuries and/or illnesses into three general categories, and in so doing fails to account for the treatment of non-life-threatening emergencies. As submitted in Exhibit I of his Memorandum in Support, the Emergency Policy states in pertinent part:

Policy: Montgomery County Jail staff members respond immediately to all incidents involving reported, witnessed or suspected staff and/or prisoner injuries sustained within the facility and render all necessary emergency treatment.

\* \* \*

Procedure A: Emergency Medical Response

1. A jail staff member witnessing, suspecting or being advised of an injury to a staff member or prisoner, contacts the health care services staff and his supervisor via the most direct means.

2. The Jail staff member secures the scene and does a pre-assessment of the situation.

3. The Jail [s]taff member renders first aid if safe to do so and awaits the arrival of a health care services staff member and the Jail supervisor.

4. The health care services staff member immediately obtains a [first-aid kit] and responds to the incident scene.

5. The health care services staff member arrives, assesses the scene, and completes a patient examination, rendering necessary medical care.

6. The Jail supervisor arrives and the staff member provides him with a verbal incident briefing.

7. The health care services staff member gives a verbal report of the situation as well as follow-up recommendations to the Jail supervisor.

8. The Jail supervisor makes decisions on what action to take based on the health care services staff member's recommendations as well as any security concerns.

9. The Jail supervisor arranges escort for the staff member or prisoner whether it be to the Jail's Health Care Services Unit,[14] local hospital, or other location deemed appropriate. The method of prisoner conveyance ([e.g.], ambulance, cruiser, under own power) is likewise to be determined by the supervisor.

10. Should there be a need to transport the staff member or prisoner to the hospital, the Jail supervisor contacts the Security Control Officer and advises him of the need.

11. The Security Control Officer arranges for the dispatching of a cruiser and/or activation of the local Emergency Medical Services Unit[15] by making the appropriate telephone contact. (See Prisoner Transports, 3.1.7[.])

12. The Jail supervisor notifies a Jail Records Officer when there is a need to transport a prisoner outside the jail.

13. A Jail staff member supervises prisoner workers in any necessary scene cleanup and follows the infection control guidelines set forth in Serious Infectious Disease, 4.5.13.

14. The originating Jail staff member completes a Jail Incident Report and a Disciplinary Record if the prisoner was involved in a rules/regulations infraction.

15. The Jail staff member delivers the completed reports to the Jail supervisor prior to the end of the watch. (See Jail

14. The policy defines the Health Care Services Unit as an area established within the jail where organized health care services are rendered on a daily basis *by qualified health care professionals* (emphasis added).

15. The policy defines the Emergency Medical Unit as the local EMT/Paramedic ambulance division that is operated and provided by the City of Dayton.

Incident Report, 3.1.24 and Prisoner Rules and Discipline, 3.3.1[.] )

16. The health care services staff member completes a Jail Incident Report and[,] if there was any exchange of body fluids, an Exposure Report, and delivers them to the Jail supervisor and the Director of Medical Services prior to the end of the watch.

17. If a staff member was injured, the staff member completes an Employee Injury Report and an Incident Report and delivers them to the Jail supervisor prior to the end of the watch.

18. If the injured staff member is physically unable to complete the required reports, the supervisor assigns an available officer to complete an Employee Injury Report and an Incident Report and deliver the reports to him, prior to the end of the watch.

19. The supervisor reviews the reports, checking them for accuracy, and forwards them to the Jail Administrator, via the Chain of Command.

■ The Court does not agree with the Plaintiff that this policy fails to account for the treatment of non-life-threatening emergencies. There is nothing about this policy that is facially infirm. The Plaintiff would have this Court deem it unconstitutional, as a violation of due process, that the Emergency Policy does not expressly require health care staff members or the medical director to be licensed physicians (*see* Doc. # 57 at 8),[16] or that a physician be "called in" promptly to treat certain injuries, such as broken bones (*see* Doc. # 55 at 22), or that detailed information be provided to any physician that is called (*see id.* at 23). It is this Court's opinion, however, that he is asking too much of the Due Process Clause. The policy to which the Plaintiff has directed the Court's attention accounts for any emergency, leaving the medical decisions, subject to obvious security concerns, to a health care staff member, who is by definition a qualified health care professional. In this regard, it is similar to any number of public schools or places of government employment, where a staff nurse directs an injured or ill child or employee to the appropriate health care provider, as necessary.

If certain County Jail officials were deliberately indifferent to the Plaintiff's serious medical needs, then he must, *first*, name those individuals as Defendants, and *second*, adduce facts demonstrating their unconstitutional acts or omissions. There being nothing in the written Emergency Policy submitted by the Plaintiff which is unconstitutional on its face, the § 1983 claim cannot survive against Sheriff Haines on a theory of municipal liability.[17]

16. According to what the Plaintiff represents to be a copy of the County Jail "Table of Organization" (Doc. # 55 at Ex. A), the Director of Medical Services is defined as a supervisor responsible for medical, mental health, and recreation staff assignments [who] oversees the health care of prisoners.

17. The Plaintiff apparently believes that Sheriff Haines must have known about the delay in procuring proper care for his injuries given the fact that, as required by the Emergency Policy, all related reports were eventually forwarded to the Jail Administrator. (*See* Doc. # 55 at 22–25.) This argument lacks merit for at least three reasons. *First*, the Sheriff is not the Jail Administrator, as the Plaintiff's own exhibits point out, so there is no reason to infer, based on the written policy, that he would have been informed of the medical decisions made with respect to the Plaintiff's injuries. (*See* Doc. # 55 at Ex. A.) *Second*, even if the Sheriff had been given copies of the pertinent reports, and even if he had actually read those reports (a fact which itself would require proof to establish), it would still not be *reasonable* to infer from his failure to second guess the medical decisions made by the qualified health care professionals lower in the chain of command that he "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers," either as an isolated matter, which might subject him to superviso-

Accordingly, as it regards the Plaintiff's § 1983 claim against Sheriff Haines, the Court does not find a genuine issue of material fact, and Defendants' Motion for Summary Judgment (Doc. # 51) is SUSTAINED.

The Plaintiff's § 1985 claim (Branch Three), for conspiracy, must also fail with respect to the Sheriff. 42 U.S.C. § 1985(3) states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To demonstrate a private conspiracy under § 1985(3), a plaintiff must prove that "the defendants (1) conspired together, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, (3) and committed an act in furtherance of the conspiracy, (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States, and (5) and that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999).

As noted, the Plaintiff's theory is that his association with a supremacy group spurred the corrections officers at the County Jail to mistreat him. His conspiracy theory is that these corrections officers acted in further agreement with certain inmates, presumably including Curry, by which the inmates were provided opportunity to physically assault him. Although defective on numerous levels, the Court need only discuss the argument's principal defect: lack of proof of conspiracy. At its essence, the Plaintiff's argument is that the circumstances of his alleged beating demand that an inference of a conspiracy be made, as it is improbable that it happened just by chance. (*See* Doc. # 55 at 26.) While in the vast universe of possibilities such an inference could be drawn, in this case it would not be reasonable absent actual proof. Plaintiff contends that another corrections officer, Michael Orihood, told him some time prior to the incident in question that he (Officer Orihood) was going to beat him up personally, as well as let a "gang" of black inmates beat him up. (*See* Gulett Depo. at 28.) This is inadmissible hearsay, given that the Plaintiff would have the Court take it for its truth and the fact that Orihood is not himself a named Defendant, and, in any event, establishes no link, either actually or inferentially, with the actions of Officer Jolly or any custom of the County Jail and Sheriff Haines.

Because the Plaintiff has not demonstrated that there exists a genuine issue of material fact with respect to his claim of conspiracy, the Plaintiff's § 1985 claim must fail as to Sheriff Haines, and in this regard, Defendants' Motion for Summary Judgment is SUSTAINED.

---

ry liability, or as a matter of custom, which might subject the county to municipal liability. *Third,* in the final analysis, it is clear that this argument is again premised on a theory of individual liability, and therefore must fail for the reasons already stated.

■ The remainder of the Plaintiff's claims arise under the law of Ohio. His fourth claim (Branch Four) states a claim for negligence. Montgomery County, as represented by Sheriff Haines in his official capacity, is immune from liability on this claim pursuant to Ohio Rev.Code § 2744.02(B)(4). His fifth claim (Branch Five), for civil assault, does not name Sheriff Haines. His sixth claim (Branch Six), for improper hiring and supervision, also sounds in negligence,[18] and must fail for the reasons given with respect to Branch Four. There being absolutely no basis for any of the substantive counts against Sheriff Haines, the seventh claim (Branch Seven), for punitive damages, is also without merit. *See also* Ohio Rev. Code 2744.05(A) (prohibiting the award of punitive or exemplary damages against a political subdivision). Therefore, to the extent it concerns claims four through seven, and as it relates to Sheriff Haines, Defendants' Motion is SUSTAINED.

Viewing all the facts and reasonable inferences which may be drawn therefrom in a light most favorable to the Plaintiff, Defendants' Motion for Summary Judgment (Doc. # 51), to the extent it is joined by Sheriff Haines, is SUSTAINED.

### 2. *Officer Jolly*

■ The Plaintiff's third claim, for conspiracy, must fail as to Officer Jolly for the reasons stated above, to wit, the Plaintiff has adduced no facts that any Defendant entered into a conspiracy. His fourth claim, for negligence, must fail because employees of subdivisions are immune from liability for acts taken in their official capacities, unless such acts were manifestly outside the scope of employment, done with malicious purpose, bad faith, or wantonly or recklessly, or liability is imposed by another section of the Revised Code. *See* Ohio Rev.Code § 2744.03(A)(6). The Plaintiff has not demonstrated that any of the exceptions to immunity apply. Officer Jolly was at all relevant times acting within the scope of his employment, and the Plaintiff has not identified any other section of the Ohio Revised Code which imposes liability for such conduct. In addition, the Plaintiff has alleged only negligence, not recklessness or bad faith, and did not submit anything further on this issue in either his Memorandum in Support (Doc. # 55) or his Response to Defendants' Motion (Doc. # 57).[19] Accordingly, the Court must recognize Officer Jolly's immunity from suit for common law negligence.[20] The Plain-

---

**18.** The Plaintiff tries to re-characterize his sixth claim as one arising under § 1983. This attempt fails, as nothing in the pleadings suggests that this was his intent at the time he filed his First Amended Complaint. The short response to the merits of this theoretical § 1983 claim premised on improper hiring and supervision is that, although such a theory is tenable under § 1983, *see City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), it would fail in this instance for utter lack of supporting evidence. The Plaintiff argues that his numerous and readily known run-ins with other inmates evidence that the corrections officers were ill-supervised by the Sheriff for purposes of finding him suitable accommodations. (*See* Doc. # 55 at 28.) If anything, the evidence shows that his run-ins were the result of his own inability to get along with others, and the reciprocal fact that most people simply do not find him enjoyable company. (*See* series of Incident Reports, attached to Flanagan Aff.)

**19.** Plaintiff only briefed the Court on his federal claims. (*See* Doc. # 55 at 9.)

**20.** For the reasons given below with respect to the Court's treatment of the Plaintiff's § 1983 claim against Officer Jolly, it could certainly be argued that Officer Jolly acted with malicious purpose, bad faith, or wantonly and recklessly, and that, as a result, he should not be immune from suit by virtue of Ohio Rev.Code § 2744.03(A)(6). The Court's point with respect to the negligence claim is that, if all of this is true, then "negligence" is

tiff's fifth claim, for civil assault, sixth claim, for improper hiring and supervision, and seventh claim, for punitive damages, are not stated as to Officer Jolly.[21] In any event, the Plaintiff has failed to show a genuine issue of material fact as to any of these claims. Accordingly, with respect to the Plaintiff's third, fourth, fifth, sixth, and seventh claims, as it relates to Officer Jolly, Defendants' Motion for Summary Judgment is SUSTAINED.

Finally, the Court will consider in greater detail the Plaintiff's second claim, arising under § 1983, insofar as it is stated against Officer Jolly. To the extent it is brought under the theory that the Plaintiff was denied proper medical care, it fails because Officer Jolly did not continue to interact with Plaintiff after delivering him to the medic's office (*see* Jolly Aff. ¶ 11; Jolly Admissions, Answer No. 13), and there is no argument that he had a duty to Plaintiff to do otherwise. The Plaintiff makes an argument that Officer Jolly violated the Emergency Policy by delivering him personally to the medic's office, as opposed to summoning the medics to retrieve him from his cellblock, as appears to be the prescribed protocol. Even if true, this is irrelevant. Whether a corrections officer leaves his post to deliver an injured inmate to the health care unit or summons a medic to do so is a matter of internal security. It has not been shown that Officer Jolly's action in this regard exacerbated the Plaintiff's injuries, and so the Court need not consider the matter further.[22]

The one issue giving the Court pause in this case is Officer Jolly's involvement, or lack of involvement, with the Plaintiff leading up to the time that he was allegedly beaten. As is clear from the holding in *Estelle, supra,* prison officials have a duty of care to prisoners in certain situations. *See DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 198, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). This duty extends, as the Supreme Court held in *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), to protect prisoners from violence at the hands of other prisoners, and is violated where prison officials are deliberately indifferent to a prisoner's serious safety concerns. In *Farmer,* seeking to craft a definition of "deliberate indifference" that is more precise, and therefore more useful and consistent, than "recklessness," the Supreme Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the

---

an improper cause of action; a tort claim which would be sustainable upon a finding of recklessness or bad faith is what the Plaintiff should have plead, and the Court cannot, *sua sponte,* simply convert a claim for negligence into a claim based on a greater showing of culpability, even though the facts may support it.

21. Even in his proposed Second Amended Complaint (attached to Doc. # 56), in which he would expressly name Officer Jolly under Branches Two, Three, and Four, he does not name Officer Jolly under Branch Seven. In any event, because all of the state law claims must fail as to Officer Jolly, it follows that punitive damages that could otherwise flow therefrom cannot be awarded.

22. By ruling in this case that Officer Jolly, Sheriff Haines, and Montgomery County cannot be held liable for being deliberately indifferent to the Plaintiff's alleged serious medical needs, the Court is not making light of his medical condition, particularly given the opinion of Dr. Danna that the Plaintiff will be permanently injured as a result of the alleged delay in getting him the medical care his injuries deserved. The Court merely finds that the Plaintiff has not adduced evidence giving rise to a genuine issue of material fact that these particular Defendants (and the county itself insofar as Sheriff Haines was sued in his official capacity as the final policy maker at the County Jail) were themselves deliberately indifferent to his serious medical needs.

official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837, 114 S.Ct. 1970. Although *Farmer* is framed under an Eighth Amendment rubric, given that pre-trial detainees are accorded at least as many rights as convicted prisoners, the same standard has been applied by the Sixth Circuit in the pre-trial detainee setting. *See Heflin v. Stewart County,* 958 F.2d 709, 714–16 (6th Cir.1992).[23] *Cf. Durham v. Nu'Man,* 97 F.3d 862 (6th Cir.1996), *cert. denied, sub nom. Glover v. Durham,* 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997)(applying standard to patient in state mental hospital). *Cf. Lintz v. Skipski,* 25 F.3d 304, 306 (6th Cir.)(recognizing deliberate indifference test applies in context of evaluating official conduct toward children in state foster home), *cert. denied,* 513 U.S. 988, 115 S.Ct. 485, 130 L.Ed.2d 397 (1994); *Meador v. Cabinet of Human Resources,* 902 F.2d 474, 476 (6th Cir.)(same), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990).

■■■ Genuine issues of material fact prevent the Court from concluding that the trier of fact could not find Officer Jolly liable under such a standard.[24] Construing the facts, and all reasonable inferences that may be drawn therefrom, in favor of the Plaintiff, it appears that he was in a cellblock where physical contact with other inmates was forbidden, that inmates in that cellblock were afforded a single hour of *solitary* free time each day, that the controls to the individual cell doors were in the exclusive control of the corrections officers, and that Officer Jolly was the corrections officer in charge of said controls on September 13, 1997. Furthermore, on that day, while enjoying his one free hour on the range, the Plaintiff was brutally beaten by an inmate, presumably Curry.

Given that the Court is merely ruling on a motion for summary judgment, the fact that Defendants dispute some of these facts, or that other explanations exist for how Curry may have gained access to the range, are of no consequence. The truth is for the trier of fact, but if the facts just recounted are all true, there is no question that a trier of fact could find that Officer Jolly acted with deliberate indifference to the exposure of the Plaintiff to unsafe conditions. With respect to whether the Plaintiff was exposed to unsafe conditions, the question is an objective one. *See Durham,* 97 F.3d at 869. With this in mind, it is reasonable to think that inmates in a special cellblock such as E–4–S, if allowed to interact, would turn to fisticuffs. Officer Jolly himself states that inmates are placed in E–4–S because they are assaultive and combative. (Jolly Aff. ¶ 21.) While it does not matter for the moment what the respective reasons were for the Plaintiff and Curry to be in E–4–S, clearly there is a security reason for sequestering certain inmates in such an environment and limiting their access to other inmates. If the policy of segregation is ignored, such that inmates in that sort of environment are permitted to interact, an objec-

**23.** Again, the Court need not address for the present whether the "deliberate indifference" test should be modified to accommodate an objective standard in the pre-trial detainee context, as suggested by the Second Circuit in *Weyant,* 101 F.3d at 845, given the fact that genuine issues of material fact would pre- clude summary judgment under either standard.

**24.** The cases make clear that whether the question posed concerns deliberate indifference to *serious medical needs* or deliberate indifference to *inmate safety,* the analysis is the same.

tive threat to the safety of the affected inmates would be posed.

*Importantly,* the Court's determination with respect to the issue of whether the Plaintiff was exposed to an objectively unsafe environment does not turn on the fact that the Plaintiff herein is an avowed racist. "[T]he Constitution does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59. While the First Amendment may provide the Plaintiff with the right to state publicly many, most, or even all of his racist beliefs, the Due Process Clause does not come to his protection when his day of reckoning arrives in a penal institution populated by persons of different ethnic, racial, religious, or national origins, some of whom may harbor deep personal animus toward him. It is a universal truth that with rights come responsibilities, and so while he may avail himself of the greatest of all rights to promote his agenda, he must also accept the consequences of his doing so. The Plaintiff does not cite, because it does not exist, authority for the proposition that prison officials must accommodate and segregate inmates of different ethnic, racial, religious, or national origins, merely because they may harbor personal animus toward others who are "different" from them. While it is clear they must be wary of inmate safety, prison officials cannot be held to having protect inmates from dangers which they bring upon themselves. They may often find it efficacious to keep certain "groups" separated, but that is a matter of administrative discretion. A hate monger has no constitutional right to his own prison suite, and in most situations it must be remem-

bered that "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management." *Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (citation omitted).

Accordingly, the Court's finding that a genuine issue of material fact exists on the issue of the Plaintiff's safety does not stem from the fact that Curry, the alleged attacker, was black and was aware of the Plaintiff's prejudice against blacks. Instead, it turns on the fact that the Plaintiff and his attacker, as with all other inmates in cellblock E–4–S, were supposed to be kept physically separated, and they were not. The Plaintiff asserts that the whole reason for his being sequestered in E–4–S in the first place was because of his association with a supremacy group. (Doc. # 55 at 3.) The Defendants argue that the Plaintiff was housed in E–4–S because of his "aggressive" interactions with the general jail population, and because he was "assaultive and combative," not because of his racist tendencies. (Doc. # 51 at 8; Jolly Aff. ¶ 21.) As the Court has noted, regardless of the actual reason for his segregation from the general jail population, the bottom line is that he was not to have direct physical contact with other inmates (Jolly Aff. ¶ 15), and a trier of fact could find that by allowing such contact to occur, the County Jail exposed the Plaintiff to an objectively hazardous situation.[25]

The Court also finds that a genuine issue of fact exists with respect to the issue of Officer Jolly's deliberate indifference. Plaintiff's burden is to show that Officer Jolly knew of and disregarded an excessive

---

**25.** In reality, a jail or prison environment is never a safe place, i.e., it is always objectively unsafe. To demonstrate that a given situation was objectively unsafe in the § 1983 context, the Plaintiff must show that the risk to which he was exposed was greater than that to which all inmates were exposed in general.

While proof that other inmates were aware of the Plaintiff's racist beliefs is not enough on its own to find that his exposure to those others posed an objectively more unsafe situation, nothing bars him from submitting evidence on this point to be considered by the trier of fact in the aggregate.

risk to the his safety; that Officer Jolly was both aware of facts from which the inference could be drawn that a substantial risk of serious harm to the Plaintiff existed, and that he actually drew that inference. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. With specific reference to the purported facts in the case at bar, if Officer Jolly: 1) had personal knowledge that the Plaintiff's attacker, whomever that may have been, harbored animus toward him, *for whatever reason;* and 2) had knowledge that the attacker was willing to act on that animus, i.e., physically assault him; and 3) allowed, by his action or inaction, a confrontation to take place, then this would constitute deliberate indifference under the test set forth in *Farmer.* In other words, the Plaintiff must prove that he was attacked by another inmate, be it Curry or another or others, that Officer Jolly could have appreciated that this event would occur, and that he was indifferent to its occurrence.[26] This is a significant burden, but the Court finds that the facts, and all reasonable inferences which can be drawn therefrom, when construed in a light most favorable to the Plaintiff, demonstrate that a genuine issue exists on this point.

Defendants describe the Plaintiff's argument as one based on innuendo, speculation, and inference upon inference (*see* Doc. # 58 at 2–5). The Court disagrees. The Plaintiff has adduced facts admissible as evidence that Officer Jolly was the corrections officer on duty on September 13, 1997, that, as the corrections officer on duty, he controlled the locks of the cell doors, and that he (the Plaintiff) was attacked by another inmate in the range, during a time at which he was to have no other contact with other inmates. It may turn out to be true, when all of the facts are known, that the Plaintiff was not beaten, and actually injured himself by falling. It may also be true that the Plaintiff was punched by another inmate through his cell gate. It may also be true that even if Curry or some other inmate (or inmates) did actually attack the Plaintiff in the range, that Officer Jolly was not aware that such a confrontation was likely to take place, and was not responsible for the inmate's having gained access thereto. Those determinations, however, are for trial. In ruling on a motion for summary judgment, the Court must accept the facts, and reasonable inferences drawn therefrom, in a light most favorable to the nonmoving party, who in this instance is the Plaintiff. Assuming the truth of the facts set forth by the Plaintiff, the Court finds it reasonable to infer that Officer Jolly knew that other inmates in E–4–S were likely to assault the Plaintiff were they afforded the opportunity to do so, and that Officer Jolly was responsible for not preventing such other inmate or inmates from actually doing so. If the trier of facts were to find these things to be true, it could find that Officer Jolly was deliberately indifferent to the objective safety concerns of the Plaintiff.

In sum, the Court finds that genuine issues of material fact exist with the respect to the issue of whether, on September 13, 1997, the Plaintiff was exposed to an objectively unsafe jail environment,

---

**26.** There need be no proof of agreement between Officer Jolly and the Plaintiff's attackers, and, as the Court has found, none has been shown. As an additional matter, the Court emphasizes that "deliberative indifference" is not to be equated with "intent," *see Farmer*, 511 U.S. at 835, 114 S.Ct. 1970, although a finding that Officer Jolly intended for the Plaintiff to be injured would certainly give rise to § 1983 liability. Deliberate indifference implies that the offending officer could appreciate the grave danger to which his indifference was exposing the inmate without actually causing or inciting the danger himself.

above and beyond that inherent to everyday jail life, and with respect to the issue of whether Officer Jolly was deliberately indifferent to this situation.

To the extent Defendants' Motion for Summary Judgment (Doc. # 51) concerns the Plaintiff's second claim (Branch Two), arising under 42 U.S.C. § 1983, and premised on Officer Jolly's deliberate indifference to the Plaintiff's safety, it is OVERRULED. In all other respects, the Motion is SUSTAINED.

### B. *Motion by Plaintiff for Summary Judgment (Doc. # 52)*

To the extent the Plaintiff moves for summary judgment on all of his claims against Sheriff Haines, and on all of the claims that concern Officer Jolly aside from that which arises under § 1983, his own Motion (Doc. # 52) is OVERRULED, because the Court is granting summary judgment to Defendants on these claims.

The only issue left to decide is whether the Plaintiff is entitled to summary judgment against Officer Jolly on the § 1983 claim (Branch Two), to the extent said claim is premised on Officer Jolly's alleged deliberate indifference to his safety. The Court finds that summary judgment is not warranted. Although the facts construed in a light most favorable to the Plaintiff could lead to a finding of liability, when they are construed in a light most favorable to Officer Jolly, the opposite result is equally plausible. Officer Jolly asserts that he was unaware of the Plaintiff's racist tendencies, that he had no reason to suspect that any other inmate intended to attack the Plaintiff, and that he did not release Curry into the range on September 13, 1997, during the Plaintiff's free hour. (*See* Jolly Aff. ¶¶ 14, 17, 18, & 20.) Furthermore, Lieutenant Flanagan has stated that there are ways in which the Plaintiff could have been harmed by an another inmate other than by such other inmate

being released into the range by a corrections officer. (*See* Flanagan Aff. ¶¶ 7 & 8.) Finally, there is Curry's denial of attacking the Plaintiff, and his statement that the Plaintiff fell. (*See* Incident Report.)

If any or all of these facts are true, as the Court must accept for purposes of ruling on the Plaintiff's Motion for Summary Judgment, then a trier of fact could *not* find that Officer Jolly was deliberately indifferent to the safety of the Plaintiff. In short, genuine issues of material fact exist which preclude the granting of summary judgment to the Plaintiff as much as they preclude the granting of such to Officer Jolly on this claim.

Accordingly, to the extent it concerns his § 1983 claim (Branch Two), as premised on Officer Jolly's alleged deliberate indifference to his safety, the Plaintiff's Motion for Summary Judgment (Doc. # 52) is OVERRULED.

### C. *Motion of Plaintiff for Leave to Amend Complaint Further (Doc. # 56)*

The Plaintiff moves to amend his First Amended Complaint so as to expressly name Officer Jolly to his second, third, and fourth claims. (*See* Doc. # 56.) As the second claim, that arising under 42 U.S.C. § 1983 (Branch Two), is all that remains, the Plaintiff's right to name Officer Jolly to that claim is the only issue the Court need consider. Leave to amend is to be freely given when justice so requires. *See* Fed.R.Civ.P. 15(a). The Court finds that leave should be granted in this instance. Although they oppose the Plaintiff's Motion (*see* Doc. # 58), the Defendants fully briefed the merits of the § 1983 claim as it applies to Officer Jolly. Accordingly, the Court finds that the Defendants, Officer Jolly in particular, will not suffer prejudice as a result of this amendment. The Motion (Doc. # 56) is therefore SUSTAINED.

## IV. *Conclusion*

For the reasons stated, as it concerns the Plaintiff's second claim, arising under 42 U.S.C. § 1983 (Branch Two), as premised on Officer Jolly's alleged deliberate indifference to the Plaintiff's safety, Defendants' Motion for Summary Judgment (Doc. # 51) is OVERRULED. In all other regards, said Motion is SUSTAINED. The Motion of Plaintiff for Summary Judgment (Doc. # 52) is OVERRULED in its entirety. The Motion by Plaintiff for Leave to Further Amend Complaint (Doc. # 56) is SUSTAINED.

To summarize what remains active in this case, Plaintiff's second claim, arising under 42 U.S.C. § 1983 (Branch Two), to the extent it is stated against Officer Jolly and is premised on that Defendant's alleged deliberate indifference to the Plaintiff's safety, remains viable. The remaining claims, with respect to both Officer Jolly and Sheriff Haines, and as-of-yet unnamed John Does, are dismissed with prejudice.